## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 7:19-cv-09832-CS** |
| ) | |
| **EYAL ALPER,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## ~~PROPOSED~~ CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT EYAL ALPER

### I.    INTRODUCTION

On October 24, 2019, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendant Eyal Alper ("Alper" or "Defendant") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2018), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1-190 (2019).

### II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against him without a trial on the merits or any further judicial proceedings, Alper:

1.    Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Eyal Alper ("Consent Order");

2.    Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission

or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledges service of the summons and Complaint;

4. Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to 28 U.S.C. §§ 1331 and 1345 (2018);

5. Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1-26 (2018), including the foreign exchange ("forex") transactions at issue in this case pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. 2(c)(2)(C) (2018);

6. Admits that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018);

7. Waives:

(a) Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018) and 28 U.S.C. § 2412 (2018), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this action;

(b) Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201-253, 110 Stat. 847, 857-74 (1996) (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

2

(c)     Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)     Any and all rights of appeal from this action;

8.     Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Alper now or in the future resides outside the jurisdiction of this Court;

9.     Agrees that he will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10.     Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party;

11.     Agrees that he shall comply with this Consent Order and shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this Consent Order;

12.     Consents to the entry of this Consent Order, without admitting or denying the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which he admits;

3

13. Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

14. Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a proceeding in bankruptcy or receivership, or a proceeding to enforce the terms of this Order;

15. Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by Paragraph 63 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States; and

16. Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Alper in any other proceeding.

## III. FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), as set forth herein.

**THE COURT HEREBY FINDS:**

## A. FINDINGS OF FACT

### The Parties to This Consent Order

17.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

18.     **Defendant Eyal Alper** is an individual who resides in Tarrytown, New York. Alper has never been registered with the CFTC.

### ·   Defendant Fraudulently Solicited Customers

19.     From at least late 2015 through October 2019 (the "Relevant Period"), Alper solicited at least thirteen (13) customers to trade futures contracts and/or retail forex through accounts managed by him. Alper's solicitations occurred primarily in telephone conversations with customers; however, in some instances, Alper met face-to-face with customers.

20.     During the course of his solicitations, Alper stated or implied to customers that he was an experienced and successful trader. He told at least one customer that he had been trading for five to seven years and that after losing money early in his career, he had not had a down month in many years and that he had experienced double digit growth. He stated to another customer that he had taken an account of approximately $40,000 and grown that into $400,000.

21.     In fact, Alper had not had an active or even a funded futures or retail forex trading account at any domestic futures commission merchant ("FCM") or retail foreign exchange dealer ("RFED") since at least as far back as January 2014.

22.     Alper also stated or implied to customers that he controlled a large-dollar trading account at FxPro, a UK-based trading firm; he told some customers that the account was over $1

5

million. Alper told customers that because of the size of his account, he was able to open sub-accounts on their behalf under his master account.

23.    In fact, Alper never had an account or any subaccounts at FxPro, and it has been the policy at FxPro since 2010 not to accept accounts from U.S. customers.

24.    Alper told customers that if they invested their money with him, he would put that money into a sub-account under his master account at FxPro and trade futures contracts and/or retail forex on a discretionary basis on their behalf. Alper said that he would charge a commission of approximately thirty percent (30%) of any profits achieved. In addition, Alper offered at least some customers a cash bonus on top of their profits if they kept their money with Alper for at least six months.

25.    On the basis of Alper's representations, at least thirteen customers sent money to Alper to trade on their behalf during the Relevant Period. Alper instructed customers to send their funds not to FxPro, but directly to him, via check, wire, bank transfer, or direct deposit. Customers' funds were deposited to bank accounts controlled by Alper.

26.    In soliciting customers, Alper made no attempt to determine if they were eligible contract participants ("ECPs") under Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2018). In fact, most, if not all, of Alper's customers were not ECPs.

## Defendant Misappropriated Customer Funds

27.    Alper never transferred any of the funds received from his customers into subaccounts at FxPro or into accounts at any domestic FCM or RFED for trading futures or retail forex. Contrary to the representations made to his customers, Alper misappropriated his customers' funds and used them to pay for his personal expenses. For example, during the Relevant Period, Alper made numerous cash withdrawals from a bank account into which

6

customer funds had been deposited, as well as numerous transfers from that account to his personal bank account. In addition, Alper used the funds in that bank account to pay for, among other things, international travel, restaurants, and car rentals.

28.     Specifically, Alper misappropriated $352,901.03 of customers' funds and used these funds to pay personal expenses, including, among other things, international travel, restaurants, and car rentals.

## Defendant Issued False Statements to Customers

29.     To conceal his misappropriation, Alper sent false statements to his customers which purported to show that their accounts were making profits. These statements consisted of screenshots sent to customers via text message which purported to show the customer's balance, equity, margin level, and gains/losses on various trades of futures contracts and/or retail forex. The statements did not contain the name of FxPro on them; nor did they contain an account number.   Indeed, Alper never provided his customers with their account numbers.   The statements were not dated; nor did they provide the date on which the purported trades listed were made.

30.     Despite the fact that no customer funds were ever transferred to FxPro, the statements sent to customers showed that their accounts were making profits. On the basis of these false statements, Alper calculated and claimed his commission from his customers. Rather than take his commission from the purported profits made by his customers' accounts, Alper convinced some of his customers to send additional funds to his bank account to pay his commission.   During the Relevant Period, Alper received $352,901.03 from customers in principal and commission payments.

7 .

**When Customers Sought to Withdraw Funds from Their Accounts, Defendant Made Further Misrepresentations to Cover Up His Misappropriation**

31.     At various times during the Relevant Period, at least nine customers sought to withdraw funds from their accounts. In some instances, Alper failed to respond at all to a customer's request. In other instances, Alper responded with various false excuses as to why he could not immediately comply with the request. Among the excuses that Alper made to customers as to why he could not comply with their withdrawal requests were that: (1) the Securities and Exchange Commission was auditing his books; (2) his accounts were frozen; and (3) the money was stuck overseas. Alper continued either to ignore customers' withdrawal requests or to make excuses to customers until they gave up on getting their money back. Alper has never returned any money to any of these nine customers in response to their requests for withdrawals.

### B. CONCLUSIONS OF LAW

#### Jurisdiction and Venue

32.     The Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, the Commission may bring an action in the proper District Court of the United States against such person to enjoin the practice, or to enforce compliance with the Act, or any rule, regulation, or order thereunder. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency

expressly authorized to sue by Act of Congress). The Commission has jurisdiction over the forex transactions at issue in this case pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2018).

33.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Alper resides in this jurisdiction and certain transactions, acts, and practices alleged in the Complaint occurred, are occurring, and/or are about to occur within this District.

## Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018) and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3)(2019)

34.      7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful for any person to:   (A) cheat or defraud or attempt to cheat or defraud another person, (B) willfully to make a false report or statement to another person, or (C) willfully to deceive or attempt to deceive another person by any means whatsoever in connection in connection with any order to make or the making of a futures contract other than on or subject to the subject to rules of a designated contract market.

35.      7 U.S.C. § 6b(a)(2)(A)-(C) applies to retail forex transactions as if they were futures contracts pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv) (2018).

36.      17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, to:  (1) cheat or defraud or attempt to cheat or defraud another person, (2) willfully to make a false report or statement to another person, or (3) willfully to deceive or attempt to deceive another person by any means whatsoever in connection with any retail forex transaction.

## a. Fraud by Misappropriation and Misrepresentations

37. By the conduct described above, Alper cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive, customers by, among other things, willfully or recklessly:

    (a)  misappropriating customers' funds and refusing to allow customers to withdraw their funds; and

    (b)  making material misrepresentations and omitting material facts to prospective and actual customers, including that:

        (i) he was an experienced and successful trader;

        (ii) he controlled a large-dollar trading account at FxPro, where accounts would be opened for customers under his Master Account;

        (iii) customer funds would be used to trade commodity futures and/or retail forex; and

        (iv) customers were earning consistent profits on their accounts;

all in connection with futures contracts and/or retail forex transactions, including the purported trading of futures contracts and/or retail forex transactions conducted or to be conducted by Alper on behalf of his customers, in violation of 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

## b. Fraud by False Statements

38. By the conduct described above, Alper willfully or recklessly issued or caused to be issued false statements to customers that disguised his misappropriation of funds and

10

misrepresented the profitability and value of customers' accounts, in violation of 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2).

## Violations of Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2018)

39.     7 U.S.C. § 6*o*(1)(A) and (B), in relevant part, makes it unlawful for a commodity trading advisor ("CTA"), by use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly, to: (A) employ any device, scheme, or artifice to defraud any customer; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any customer.

40.     7 U.S.C. § 6*o*(1)(A) and (B) applies to CTAs engaging in retail forex transactions pursuant to Section 2(c)(2)(C)(ii) and (vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii), (vii) (2018).

41.     7 U.S.C. § 6*o*(1)(A) and (B) applies to all CTAs, whether registered, required to be registered, or exempted from registration.

42.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018), defines a CTA as any person who for compensation or profit, engages in the business of advising others as to the value or advisability of trading in, among other things, futures contracts or retail forex transactions. Similarly, Regulation 5.1(e)(1), 17 C.F.R. § 5.1(e)(1) (2019), defines a CTA as "any person who exercises discretionary trading authority or obtains written authorization to exercise discretionary trading authority over any account for or on behalf of any person that is not an [ECP] in connection with retail forex transactions."

43.     In the case of an individual, 7 U.S.C. § 1a(18)(A)(xi) defines an ECP to mean a person "acting for its own account . . . who has amounts invested on a discretionary basis, the aggregate of which is in excess of – (I) $10,000,000; or (II) $5,000,000 and who enters into the

11

agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."

44.     By the conduct described above, Alper acted as a CTA as defined in part by 7 U.S.C. § 1a(12) (2018), in that, for compensation or profit, he engaged in the business of advising others as to the value or advisability of trading in, among other things, futures contracts or retail forex transactions. Similarly, by the conduct described above, Alper acted as a CTA as defined by Regulation 5.1(e)(1), 17 C.F.R. § 5.1(e)(1) (2019), in that he exercised discretionary trading authority or obtained written authorization to exercise discretionary trading authority over accounts for or on behalf of persons who were not ECPs in connection with retail forex transactions.

45.     As set forth above, Alper, while acting as CTA, through use of the mails or other means or instrumentalities of interstate commerce, directly or indirectly employed a device, scheme, or artifice to defraud customers and engaged in transactions, practices, or courses of business that operated as a fraud or deceit upon customers, by among other things:

      (a)    misappropriating customers' funds;

      (b)    making material misrepresentations and omitting material facts to prospective and actual customers; and

      (c)    making, causing to be made, and distributing reports or statements to customers that contained false information,

all in connection with the purported trading of futures contracts and/or retail forex transactions conducted or to be conducted by Alper on behalf of his customers, in violation of 7 U.S.C. § 6o(1)(A) and (B).

12

## Violation of Regulation 4.30(a), 17 C.F.R. § 4.30(a) (2019)

46. 17 C.F.R. § 4.30(a) prohibits a CTA, whether registered, required to be registered, or exempted from registration, from soliciting, accepting, or receiving from an existing or prospective customer funds in the CTA's name to purchase, margin, or guarantee any commodity interest of the customer.

47. By the conduct described above, Alper violated 17 C.F.R. § 4.30(a), in that he solicited, accepted, and received funds from customers in his own name for the purpose of purchasing, margining, guaranteeing, or securing futures contracts and/or retail forex contracts for them.

### Need for Injunction

48. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Alper will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.    PERMANENT INJUNCTION

## IT IS HEREBY ORDERED THAT:

49. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), Alper is permanently restrained, enjoined, and prohibited from directly or indirectly:

> (a)    in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market, (A) cheating or defrauding or attempting to cheat or defraud the other person; (B) willfully making or causing to be made to the other person any false report or statement or willfully entering or causing to be entered for the other person any false record; or (C) willfully deceiving or attempting to deceive the other person by any means whatsoever in regard to any order

13

or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person, in violation of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018);

(b)    by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction, (1) cheating or defrauding or attempting to cheat or defraud another person, (2) willfully making a false report or statement to another person, or (3) willfully deceiving or attempting to deceive another person by any means whatsoever, in violation of Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2019).

(c)    as a CTA, using the mails or any means or instrumentality of interstate commerce, directly or indirectly to (A) employ any device, scheme, or artifice to defraud any customer; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any customer, in violation of Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1) and (B) (2018); and

(d)    while acting as a CTA, soliciting, accepting, or receiving from an existing or prospective customer funds, securities, or other property in his name (or extending credit in lieu thereof) to purchase, margin, guarantee, or secure any commodity interest of the customer.

50.    Alper is also permanently restrained, enjoined, and prohibited from directly or indirectly:

(a)    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

(b)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for his own personal account or for any account in which he has a direct or indirect interest;

(c)    Having any commodity interests traded on his behalf;

(d)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(e)    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

14

(f)     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and/or

(g)     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2018)), registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019).

## V.     RESTITUTION AND CIVIL MONETARY PENALTY

### A. Restitution

51.     Alper shall pay restitution in the amount of three hundred fifty-two thousand, nine hundred one dollars and three cents ($352,901.03) ("Restitution Obligation"), representing the customer losses that he caused through misappropriation of customer funds in connection with such violations, plus post-judgment interest. Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

52.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to customers by Alper, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from Alper and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

53.     Alper shall make Restitution Obligation payments under this Consent Order to the Monitor in the name "Eyal Alper Restitution Fund" and shall send such Restitution Obligation

15

payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under cover letter that identifies the paying Defendant and the name and docket number of this proceeding. Alper shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

54.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to participants identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part V. B. below.

55.     Alper shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Alper shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

56.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Alper's customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

57.     The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Alper or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any participant that exist under state or common law.

58.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Alper who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Alper to ensure continued compliance with any provision of this Consent Order and to hold Alper in contempt for any violations of any provision of this Consent Order.

59.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Alper's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B. Civil Monetary Penalty**

60.     Alper shall pay a civil monetary penalty in the amount of three hundred fifty-two thousand, nine hundred one dollars and three cents ($352,901.03) ("CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2018).

17

61.     Alper shall pay his CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Alper shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Alper shall accompany payment of the CMP Obligation with a cover letter that identifies Alper and the name and docket number of this proceeding. Alper shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

### C. Provisions Related to Monetary Sanctions

62.     Partial Satisfaction: Acceptance by the Commission or the Monitor of any partial payment of Alper's Restitution Obligation or CMP Obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI. MISCELLANEOUS PROVISIONS

63.     Notice: All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Richard A. Glaser
> Deputy Director
> Commodity Futures Trading Commission
> 1155 21st Street, N.W.
> Washington, D.C. 20581

Notice to Defendant Eyal Alper:

> Eyal Alper
> c/o John J. Macron
> Attorney & Counselor At Law
> 491 Bard Avenue
> Staten Island, NY 10310
> 718-889-3583

All such notices to the Commission shall reference the name and docket number of this action.

63.     Change of Address/Phone: Until such time as Alper satisfies in full his Restitution Obligation and CMP Obligation as set forth in this Consent Order, Alper shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

64.     Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

65.     Invalidation: If any provision of this Consent Order, or if the application of any provision or circumstance, is held invalid, then the remainder of this Consent Order and the

19

application of the provision to any other person or circumstance shall not be affected by the holding.

66.    Waiver: The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

67.    Waiver of Service, and Acknowledgement: Alper waives service of this Consent Order and agrees that entry of this Consent Order by the Court and filing with the Clerk of the Court will constitute notice to Alper of its terms and conditions. Alper further agrees to provide counsel for the Commission, within thirty (30) days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that he has received and read a copy of this Consent Order.

68.    Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Alper to modify or for relief from the terms of this Consent Order.

69.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Alper, upon any person under his authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Alper.

20

70. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

71. Contempt: Alper understands that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings he may not challenge the validity of this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendant Eyal Alper* forthwith and without further notice., and to close the case.

**IT IS SO ORDERED** on this _2nd_ day of _____June_____, 2020.

Cathy Seibel

~~JUDGE~~

UNITED STATES DISTRICT JUDGE

21

CONSENTED TO AND APPROVED BY:

_Eyal Alper_

Eyal Alper

Date: _5 / 2 / 2020_

Approved as to form:

_John J. Macron_

John J. Macron
Attorney & Counselor At Law
491 Bard Avenue
Staten Island, NY 10310
Telephone: (718) 889-3583
Facsimile: (718) 889-3584

Date: _5 / 2 / 2020_

_Alan Edelman_

Alan Edelman
Senior Trial Attorney
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5523

Date _5/27/2020_

22